Ronnie Lee **HILL**, Appellant,

v.

The **STATE** of Texas, Appellee.

No. 09–93–183 CR.

Court of Appeals of Texas, Beaumont.

Nov. 23, 1994.

Douglas M. Barlow, Beaumont, for appellant.

Tom Maness, Dist. Atty., John R. DeWitt, Asst. Dist. Atty., Beaumont, for state.

Before WALKER, C.J., and BROOKSHIRE and BURGESS, JJ.

## OPINION

BROOKSHIRE, Justice.

This is an appeal from a jury trial in which the appellant was convicted of the offense of murder. The indictment included three enhancement paragraphs. The appellant pleaded "true" to the enhancement paragraphs. The jury found the appellant guilty and assessed his punishment at confinement for life in the Institutional Division of the Texas Department of Criminal Justice. On appeal the appellant has submitted to this court three points of error. We affirm the judgment.

Lula Mitchell's untimely death arises from an ill-fated, one-sided love affair between the appellant and the decedent's daughter, Carolyn Mitchell. Carolyn and the appellant had entered into a liaison and had lived together for about seven months. However, on or about January 10, 1993, Carolyn decided to move out because the relationship had become unbearable due to the threatening remarks appellant had made to her. She moved in with her mother. Carolyn's mother, Lula Mitchell, lived at 1945 Nora Street in Beaumont, Jefferson County, Texas. This relocation by Carolyn was the beginning of her horrible nightmare.

On January 24, 1993, Carolyn had just finished taking her bath when she saw the defendant walking in front of her mother's home. She informed her mother of the appellant's appearance. Inside the house were Carolyn, her mother (the decedent), and Carolyn's two children, whose ages were one and three. After informing her mother of the appearance of the appellant outside the home, her mother went to the front door and asked the appellant why was he coming around her house and asked him to cease and to stay away. He responded by asking to speak to Carolyn, however, her mother refused his request. The appellant began to shout but then retreated and left the premises. He returned and upon his return he approached the door where her mother was standing—the only thing separating the two was the screen door—whereupon, appellant pulled out a knife and stabbed Carolyn's mother to death. Appellant stabbed the decedent through the screen door. Lula Mitchell collapsed. Appellant told Carolyn to go and call the police and to tell the police that "I did that" (meaning the appellant). After the appellant stabbed Carolyn's mother, appellant entered the home and began to struggle with Carolyn. In the struggle, Carolyn was cut. After cutting Carolyn the appellant left the premises.

Carolyn was an eye-witness to the entire gruesome event. She was one of several

witnesses who testified for the State against the appellant.

In the appellant's first point of error he alleges that "the trial court erred in admitting evidence of extraneous offenses." The appellant alleges that the admittance of testimony of one of the State's witnesses introduced certain incidents of violence and extraneous offenses against persons other than the alleged victim and this evidence was so extremely prejudicial so as to outweigh any possible relevance or probative value. The appellant objected to the admittance of this one witness' testimony but the trial court overruled his objection.

In light of the appellant's contention, we will appraise this case under the standards laid down in *Montgomery v. State,* 810 S.W.2d 372 (Tex.Crim.App.1993) (Opinion on Rehearing). It is important to note that the three specific items of testimony of which the appellant complains relate only to testimony concerning certain conduct of the appellant toward Carolyn and her children.

■ The objected-to testimony of Carolyn Mitchell is reflected in the record as:

Q. [The Prosecutor]: So, I take it you moved out from living with Mr. Hill about two weeks before all this happened?

A. [State's witness, Carolyn Mitchell]: Yes, Ma'am.

Q. Why did you move out?

A. Because he was threatening me.

Q. How was he threatening you?

A. Threatening me telling me if I ever—

MR. BARLOW: (Interrupting) Your Honor, I'll object to that, referring to extraneous offenses.

THE COURT: Sustain the objection.

MR. BARLOW: And I would request for the jury to be instructed to disregard that line of questioning and the testimony by this witness in that regard.

THE COURT: Jury disregard the last testimony by this witness.

MR. BARLOW: And we'd move for a mistrial on that basis.

THE COURT: Mistrial denied.

It is obvious that the trial court did not admit this testimony into evidence by the trial court's sustaining the appellant's objection. Therefore, we find that the trial court's instruction to disregard was sufficient to cure any possible error as to this testimony. *See Gardner v. State,* 730 S.W.2d 675 (Tex.Crim.App.1987).

■ Next, the appellant complains of the following quoted testimony, as reflected:

A. He crossed over my mom's body and came in and started with me.

Q. [The Prosecutor] After he stabbed your mom, what did your mom do?

A. [State's witness, Carolyn Mitchell]: My mom just grabbed herself like this here and fell on the porch and hollered for help.

Q. So, she fell on the porch. Where on the porch did she fall? Because the door evidently was closed. What happened?

A. She just fell on the screen. And when her body just fell on the screen, it just pushed the screen door open; and she was laying on the porch bleeding.

Q. Okay, So, was the door—it remain [sic] open after she fell, or did it close?

A. It remained open.

Q. What did Mr. Hill do then?

A. Came in, started—you know, I was struggling with him. We was, you know, tussling.

MR. BARLOW: [Defense Counsel]: I'll object to that, Your Honor, it refers to offenses extraneous to that which he's charged with here.

THE COURT: Overruled.

MR. BARLOW: Could I have a running objection to that line of testimony, then, Your Honor?

THE COURT: Yes, Sir.

(By Ms. Moore)

Q. Okay. You said he started doing something to you. What exactly was he doing to you?

A. He come in and started cutting—you know, we was tussling. I was trying to take the knife from him.

Q. Was he going after you with the knife?

A. Yes, he was coming after me with a knife; and we were struggling. He pushed me up against the TV. I fell down. I didn't realize I was cut until, you know, afterwards.

Q. Carolyn, what was going through your mind at that time when he came after you?

A. I can't believe he did this, why he just wouldn't let me be, you know.

Q. Were you afraid?

A. Yeah, a little bit.

Q. Did you think he was going to do to you what he had just done to your mom?

A. Yes.

MR. BARLOW: I'll object to that, Your Honor, it's going beyond what's admissible as to state of mind; and she's also leading her witness again.

THE COURT: Overruled.

(By Ms. Moore)

Q. Is that what you were afraid of?

A. Yes, ma'am.

Q. Now, when he came into the house, if your mother had just fallen, how did he get around her?

A. He crossed over her body.

Q. Just walked over her?

A. Un-huh.

Q. How about your kids? Did he try anything to your kids?

A. He tried to—he leaned over, tried to stick them, too, but I pushed them out of the way, and that's how I got cut on my arm and on my elbow.

Q. Did you succeed in keeping him away from your kids.

A. Yes, ma'am.

Q. Were you screaming or saying anything to him at that time?

A. I was telling him to get out, why is he in my house, why is he doing this to me. You know, he had no right to do that.

Again, the witness was allowed to detail the extent of her injuries, despite the fact that appellant had lodged a running objection to said testimony:

Q. [The Prosecutor]: Can you continue on now, Carolyn?

A. [State's Witness, Carolyn Mitchell]: (Nodding affirmatively)

Q. Carolyn, did you have to go to the hospital that night?

A. Yes, ma'am.

Q. Were you injured?

A. Yes, ma'am, I was.

Q. Can you still see where you were injured?

A. Yes, ma'am.

Q. How can you tell where you were injured?

A. I have the cuts to show for it.

Q. Do you still have some scars?

A. Yes, I do.

Q. Where are they?

A. On my upper right back, my elbow and my arm, left arm.

Q. Do you have one right here?

A. Un-huh.

Q. Would you kind of hold your arm up?

A. (Indicating)

Q. Carolyn, I'm going to show you what's been marked as State's Exhibit No. 2. If you would, tell me what this is.

A. A picture of my mother. That was my best friend.

Q. Carolyn, is that a fair and accurate picture of the way your momma looked on that night?

A. Yes.

We are well aware that under *Montgomery v. State, supra,* that the granting of a running objection was sufficient to invoke TEX.R.CRIM.EVID. 404(b). Under Rule 404(b) there exists some exceptions. Rule 404(b) enumerates specific purposes for which "other crimes, wrongs, or acts" are admissible. The rule also includes "other purposes" which is neither exclusive nor collectively exhaustive. Rule 404(b) states that evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he or she acted in conformity therewith. The rule and its concept envisioned past crimes and offenses. Here, Carolyn was testifying as to the present, dramatic, horrendous acts by appellant. Carolyn was not attempting to prove the

character of Hill; nor that Hill was acting in conformity therewith, Hill had not stabbed Lula previously. Obviously, Carolyn's testimony was admissible as proof of the motives of Hill, Hill's intention, preparation, plan and knowledge as well as the absence of accident. Interestingly, the testimonies of some later witnesses strongly corroborated Carolyn's evidence, making the same admissible under Rule 404(b). *See Montgomery, supra.*

In *Rogers v. State,* 853 S.W.2d 29 (Tex. Crim.App.1993), the Court of Criminal Appeals discussed "same transaction contextual evidence" and held such evidence was admissible as an exception to Rule 404(b) where such evidence was necessary to the jury's understanding of the charged offense. In so holding, the Court of Criminal Appeals quoted from their plurality opinion in *Mayes v. State,* 816 S.W.2d 79 (Tex.Crim.App.1991):

> Same transaction contextual evidence is deemed admissible as a so-called exception to the propensity rule where "several crimes are intermixed, or blended with one another, or connected so that they form an indivisible criminal transaction, and full proof by testimony, whether direct or circumstantial, of any one of them cannot be given without showing the others." [citation omitted] The reason for its admissibility "is simply because in narrating the one it is impractical to avoid describing the other, and not because the other has any evidential purpose." [citation omitted] Necessity, then, seems to be one of the reasons behind admitting evidence of the accused's acts, words and conduct at the time of the commission of the offense.

As noted above, the appellant had just stabbed Carolyn's mother in her chest. The knife he used to stab Lula Mitchell was the same one he was trying to assault Carolyn with. This whole event took place before Carolyn's eyes.

The facts and circumstances of the charged offense would make little or no sense without also admitting this same transaction contextual evidence as it related to Carolyn. Therefore, we conclude the appellant's complaint of extraneous offenses is not sustainable; point of error one is overruled.

■ Another witness to this horrible event was sixteen-year-old Michael Relford. He was also called by the State. He testified that on the day of the stabbing that he had seen the appellant walking down the street. Michael said that he knew the defendant because of the appellant's relationship with Michael's best friend's sister, Carolyn. Michael's aunt lives across the street from the Mitchell home. *Michael stated that he saw the appellant carrying an eight-inch butcher knife in his hand at the corner of Inca and Nora. Michael saw the argument which ensued between the decedent and the appellant.* They were shouting and the appellant was calling her inappropriate names. *Michael saw the appellant pretend to leave the premises, but then return and stab Lula Mitchell through the screen door, causing her untimely death.*

Also, Michael saw the appellant go into the home and confront Carolyn. *After terminating the confrontation with Carolyn, the appellant left the premises and started running down the street.* Michael testified that some days prior to this fatal occasion that he had overheard a conversation between Leo, Carolyn's brother, and the appellant in which the appellant made a remark to both Michael and Leo that appellant was going to hurt Carolyn and if her mother, Lula, got in the way, that he was going to hurt her also. This testimony was admitted into evidence without objection.

The State's next witness was Charles Relford, a cousin of Michael Relford. Charles testified that he viewed the stabbing from his parents' bedroom window. The Relford house was directly across the street from the Mitchell house. Charles stated that he saw Ronnie Lee Hill, the appellant, as he hit Mrs. Mitchell and he saw the knife after it was pulled from the body of Mrs. Mitchell. He also testified that after the appellant had stabbed Mrs. Mitchell, the appellant entered the Mitchell house. At the same time the appellant was entering the house, Charles was dialing 911. Charles saw the appellant leave the house after fighting with Carolyn with the knife in his (appellant's) hand. Charles testified that the appellant speedily

walked away from the Mitchell's home down Nora Street.

The next witness to testify for the State was Mrs. Fara Relford who lived at 1930 Nora Street. Mrs. Relford had lived at this residence for 33 years. On the night of the stabbing, Mrs. Relford testified that she did not actually see the stabbing, but she did see the appellant as he left the porch of the Mitchell's home and as he was wrapping something around his arm and then appellant proceeded to walk very rapidly down Nora Street. Mrs. Relford testified that she went to the Mitchell house and saw Mrs. Mitchell bleeding and that Mrs. Mitchell was calling out "help me, help me". Mrs. Relford said that after hearing the outcry she returned home to get a wrap to lay across Mrs. Mitchell, whereupon the police arrived. Mrs. Relford stood there for awhile and then returned home.

The State's next witness to testify was Lemuel Relford, the son of Mrs. Fara Relford. Lemuel resided with his mother at 1930 Nora Street. Lemuel testified that on the evening of the stabbing he observed the appellant coming out of the Mitchell house wrapping something up with a towel whereupon appellant took off running down the street. Lemuel testified that it was somewhat unusual for the appellant to be in the neighborhood so often. Lemuel stated that he had observed the appellant every day for a week prior to the incident looking towards the Mitchell's home. On one occasion the appellant was in a wooded area behind the Relford house, gazing through the trees in the direction of the Mitchell house.

Lemuel testified that on another occasion he asked the appellant why was he in the neighborhood and the appellant replied "I'm going to get her. I'm going to get her." Lemuel asked the appellant who do you mean, and the appellant did not give a name, but said "I'm going to get that fat bitch." It should be noted that this testimony was not objected to by the defense, and was admitted into evidence. A photograph identified as State's Exhibit No. 2 was introduced and this photograph showed that Mrs. Lula Mae Mitchell was indeed a very heavy person.

The next witness to testify for the State was James Johnson. James lived at 2250 Potts Street in Beaumont. James was going with the decedent's daughter Tammy, the sister of Carolyn. He stated he had known the appellant for nearly two years and that prior to the incident in the case at bar that he had spoken to the appellant in passing. This conversation took place right after Carolyn had moved out from the appellant's residence. When James saw the appellant on the street, the appellant informed James that he was going to do something to Carolyn. The appellant seemed to be obsessed with trying to reconcile with Carolyn.

Tammy Mitchell testified that at around 10:00 p.m. the night before the stabbing she saw the appellant. The appellant had come to her home wanting to know where her sister Carolyn was. Tammy informed the appellant that she did not know where her sister Carolyn was. The appellant acted as if he were going to enter Tammy's home, but he did not, and then he informed Tammy that he was going to kill Carolyn.

The evidence given by Michael, Charles, Mrs. Fara Relford, and others tends to prove motive, intent, preparation, plan, knowledge, malice, the absence of accident or mistake on the part of appellant. Furthermore, appellant failed to make a correct objection as to these later witnesses. We conclude the appellant waived his contentions as to other wrongs or acts as to the other witnesses. In *Montgomery, supra,* the Court of Criminal Appeals observed that and required that proper timely objections must be made to preserve the appellant's contentions under Rules 403 and 404(b).

■ Appellant's point of error number two contends that the trial court erred in failing to charge the jury properly regarding the murder/voluntary manslaughter issue. The appellant argues that the trial court improperly changed the State's burden of proof in trying to negate the sudden passion issue from the murder portion of the charge and because of this improper shifting of the burden of proof the appellant was denied a fair trial and denied due process of law. The particular language to which appellant has reference reads:

Now, if you believe from the evidence beyond a reasonable doubt that in Jefferson County, Texas, on or about January 24, 1993, the defendant Ronnie Lee Hill, did then and there intentionally or knowingly cause the death of an individual, namely: Lula Mitchell, hereafter styled the Complainant, by stabbing Complainant with a deadly weapon, to-wit: a knife, that in the manner of its use or intended use was capable of causing serious bodily injury or death, you shall find the defendant guilty of the offense of murder.

Unless you so find, or if you have a reasonable doubt thereof, you shall find the defendant not guilty.

Appellant objected to the quoted language above that was used in the charge. Appellant requested that the State negate "sudden passion" or "voluntary manslaughter".

■ When evidence of voluntary manslaughter is raised, the charge must require the State to negate the sudden passion issue in order to find a defendant guilty of murder. *See Cobarrubio v. State,* 675 S.W.2d 749 (Tex.Crim.App.1983). The appellant here contends that in the case at bar that the facts in evidence before this jury were clearly sufficient to raise the issue of sudden passion and that it was necessary for the trial court to include this element in the charge.

We disagree with the appellant's argument. Also, *Cobarrubio* is not applicable to the case at bar. It is certainly clear to us from reading and analyzing the record before us that there was no evidence in this case that indicated that the appellant was acting under the immediate influence of any sudden passion arising from any adequate causes when he stabbed and killed Mrs. Mitchell. The record indicates clearly that appellant planned to inflict egregious harm, if not death, to Carolyn and her mother. Absent any such evidence (sudden passion) the appellant was not entitled to such a charge as requested on murder.

The record before us in the appellant's case is readily distinguishable from *Cobarrubio, supra.* In *Cobarrubio,* the evidence clearly raised the fact issues that during an altercation the deceased was struck in the head by one of four shots fired by the appel-

lant from a .25 caliber pistol. *Cobarrubio* clearly demonstrated by testimony that he was on his way to the countryside to try out his new automatic pistol. On the way to the country, Cobarrubio was confronted by the deceased victim. The deceased victim had quarreled with a cousin of Cobarrubio a few days before. Firstly, Cobarrubio was confronted by and encountered very provocative language from the deceased. Then hostile conduct followed from the deceased.

Cobarrubio testified that it was necessary for him to prepare to defend himself. The deceased victim kicked Cobarrubio in the stomach and then kicked Cobarrubio twice in the face. Cobarrubio was in a dazed state. He then pulled his pistol and fired in the direction of the deceased. Those facts or similar facts are simply not in our record.

Lula Mitchell was not kicking Hill in the stomach or in the face. *She was merely standing at her own front door, as she had a right to do, in an effort to protect her own beloved daughter, which she had a right to do.* The offense of voluntary manslaughter, even if it is a type of defense against murder, has to be raised by some evidence that the sudden passion must have arisen from an adequate cause. No adequate cause exists. No evidence exists tending to prove that Hill was acting under the immediate influence of sudden passion. The record clearly shows that the appellant had made both plans and statements about Lula.

Moreover, sudden passion, to be germane, must have been caused by and must have arisen out of provocation by the individual killed, Lula Mitchell. Lula did not provoke a sudden passion in Hill. Any such sudden passion or hatred or animus towards Lula did not arise at the precise time of the offense, but the same arose—if it did, which we deny—over a reasonably lengthy period of time.

Significant is the fact that the court charged the jury that the jury alone has the authority and duty to determine what the facts are in this case. Very importantly the court charged the jury this:

The presumption of innocence alone is sufficient to acquit the defendant, unless the

jurors are satisfied beyond a reasonable doubt of the defendants's [sic] guilt *after careful and impartial consideration of all the evidence in the case.* (emphasis added)

Note that the jurors are instructed to give careful and impartial consideration to all the evidence in the case. Further, the court instructed:

> The prosecution has the burden of proving the defendant guilty and it must do so by proving each and every element of the offense charged beyond a reasonable doubt and if it fails to do so, you must acquit the defendant.

The record proves that the trial judge read the entire charge to the jury before the arguments and the examples of verdict were aligned very favorably to the defendant. The first form of verdict was a finding of not guilty. The second specie or special form of verdict was that the jury could find the defendant not guilty of murder as charged in the indictment, but guilty of the lesser included offense of voluntary manslaughter. The last form of verdict was:

> WE, THE JURY, find the defendant GUILTY of the offense of murder, as alleged in the indictment.

In fact, the record proves that the trial judge read correctly the entire charge to the jury so the jury had to be advised of the voluntary manslaughter charge. Before the murder application paragraph the trial judge charged the jury as follows:

> PRIOR RELATIONSHIPS: You are entitled to consider all of the relevant facts and circumstances surrounding this offense and the previous relationship existing between the accused and the victim, together with all relevant facts and circumstances going to show the condition of the mind of the accused at the time of the offense.

As an intermediate, appellate court, we are bound by the diktats and instructions of the Court of Criminal Appeals. We have no choice or discretion in the matter. Defense counsel specifically, relevantly and correctly objected to the application paragraph on the charge regarding the offense of murder. Defense counsel observed that there were two application paragraphs in the charge, one on murder and a second one on voluntary manslaughter. Defense counsel precisely objected to the application paragraph regarding murder on the basis of *Cobarrubio v. State, supra,* and cited that case by exact style and objected to the application paragraph regarding murder because it did not require the State to negate the influence of sudden passion or negate voluntary manslaughter before the jury would be properly authorized to find the defendant guilty of murder. In *Cobarrubio,* by Judge Clinton's diktat, the proper wording of the two application paragraphs were pontificated in note 8 at 751:

> For an example of a proper charge see McClung, Jury Charges for Texas Criminal Practice (Jan.1981) 47, 48, which states in pertinent part:

"4.

> Now, if you find from the evidence beyond a reasonable doubt that on or about the ____ day of _____, 19__ in ____ County, Texas, the defendant, AB, did intentionally or knowingly cause the death of an individual, CD by shooting him with a gun, and that the defendant, *in so acting, was not acting under the immediate influence of sudden passion arising from an adequate cause, then* you will find the defendant guilty of murder, as charged in the indictment.

\* \* \* \* \* \*

5.

> If you find from the evidence beyond a reasonable doubt that on or about the ____ day of _____, 19__ in ____ County, Texas, the defendant, AB, did intentionally or knowingly cause the death of an individual, CD, by shooting him with a gun, but you further find and believe from the facts and circumstances in evidence in the case that the defendant, in killing the deceased, if he did, acted under the immediate influence of sudden passion arising from an adequate cause, or if you have a reasonable doubt as to whether he so acted under the immediate influence of a sudden passion arising from an adequate cause, then you will

find the defendant guilty of voluntary manslaughter.:

See also Texas Criminal Pattern Jury Charges, CPJC 19.02(VM) at 119–120." (emphasis theirs)

Neither of the application paragraphs in appellant's case adhered to Judge Clinton's diktats. Appellant has demonstrated a preferable, more exact type of charge as to the application paragraphs. Nevertheless, Judge Clinton conceded that the distinguishing feature between murder and voluntary manslaughter is not a fact that must be proven beyond a reasonable doubt to establish voluntary manslaughter; nor is it a fact that must be disproven by the State to establish murder in the absence of some evidence raising an issue as to that distinguishing fact or feature. But clearly, the issue must be raised. In this record the issue was simply not raised. No error is shown.

In his brief, the appellant cites various testimonies of the State's witnesses which he states supports his position for an instruction on "sudden passion". After reviewing the cited portions of the testimony, it becomes immediately apparent that each and all these items clearly relate to the volatile, long-standing relationship between the appellant, Carolyn, and the decedent. There is nothing in the record which indicates any sudden passion arising—certainly not as to Lula. These cited portions reinforce the conclusion that the appellant *planned* to kill or seriously harm the decedent or Carolyn.

Indeed, the testimony of the several State witnesses that were mentioned in the appellant's brief and arguments tend to disprove rather than support "sudden passion". Appellant, long before the stabbing, made threats to harm either Carolyn or her mother. The record indicates that one witness testified that even one week before the actual stabbing the appellant was looking at the Mitchell house and upon being questioned by the witness, the appellant replied: "I'm going to get her. I'm going to get that fat bitch." It is very important to point out that at no time during the fatal occasion did the appellant say anything to Carolyn or to the decedent after his arrival at the Mitchell house

that would support any sudden passion element.

The jury was provided with verdicts of not guilty and guilty of voluntary manslaughter. We overrule appellant's point of error number two.

In appellant's point of error number three, he asserts that the evidence was insufficient to establish one of the elements alleged in the indictment, *i.e.*, that appellant stabbed the decedent with a deadly weapon as alleged in the indictment. We find that the evidence was sufficient to establish beyond any doubt that the appellant did stab the decedent with a deadly weapon. It is uncontroverted through the testimony of several witnesses conclusively stating that the appellant stabbed Lula Mitchell with a knife. It is uncontroverted that the wounds inflicted by the appellant from the knife penetrated the decedent's heart which resulted in her death. We overrule point of error three.

Having found no error, we affirm the judgment of the trial court.

AFFIRMED.

BURGESS, Justice, dissenting.

I respectfully dissent to the majority's disposition of point of error two. The majority acknowledge the charge on voluntary manslaughter, as given, did not adhere to *Cobarrubio v. State*, 675 S.W.2d 749, 751 (Tex. Crim.App.1983), *overruled in part* by, *Lawrence v. State*, 700 S.W.2d 208 (Tex.Crim. App.1985), yet find no error. They determine no error was shown since, in their view, the issue was not raised. However, the State never voiced any objection to the voluntary manslaughter issue, much less an objection that the issue was not raised by the evidence. Apparently all parties, the State, the defense and the *judge* felt there was sufficient evidence to raise the issue. Consequently the only issue before this court should be whether the jury was given the issue correctly. Obviously, they were not. Therefore I would reverse and remand.